Case number 20-7114. Ramona Matos Rodriguez et al versus Pan American Health Organization appellant Joaquin Molina et al. Mr. Bowker for the appellant. Mr. Dubin for the appellee. Mr. Yelling, amicus curiae. All right, Mr. Bowker, good morning. Please proceed. Good morning, your honor. May it please the court. David Bowker especially appearing for and Nelson and this court's decision on remand in JAM v. IFC all require reversal here under the IOIA. Those cases demonstrate that the district court misidentified the grovelman of the 1589b claim and thus wrongly concluded that the grovelman of that claim constitutes commercial activity. Sachs, Nelson and this court's decision in JAM all instruct that the grovelman of the claim or the grovelman of the action is the conduct that it is based upon, the core or foundation that it is based upon. Here, that core, that foundation is forced labor and trafficking. And I take it, Mr. Bowker, that your position on that would be the same if Matos had only brought the one TVPA claim under 1589b just benefiting from trafficking or forced labor, that even even that claim, which is about economic benefit and which I don't think you dispute that benefit is taking place for PAHO in the United States, that nonetheless, the grovelman of that claim would also be in Brazil. It is correct that the grovelman of that claim alone, standing alone, would be forced labor and trafficking. And the reason is the language of the statute refers to knowingly benefiting from participation in a venture that's engaged in providing or obtaining forced labor. And the title of that section for both 1589a and 1589b is forced labor. And if we look at the complaint, the count that makes the 1589b claim says, quote, that PAHO knowingly benefited financially from trafficking of plaintiffs in violation of 1589b. And it says that... So what you're saying is that there has to be proof of the trafficking of the plaintiffs and that's why the grovelman is trafficking? I think it may even... I don't think it turns on a single element that way, that you need to establish each element and that we're focused only on one element. Rather, we're following the direction of Sachs, Nelson, and this board and foundation of the suit. Just putting aside the Foreign Sovereignty Act issue for a moment, if medical suppliers are us, a US firm sold bandages, thermometers, stethoscopes, stretchers in the US for a profit, and it was proved that those goods were manufactured abroad by forced labor, it seems like there's little question that that business, that American business would be under 1589b, right? I think that's right, Your Honor. But there, obviously, you're not dealing with the FSIA or the IOIA. So if PAHO were doing the same thing, were selling those same goods that were produced overseas with traffic to forced labor and PAHO were aware of that, in your view, that is not enough for that exact same claim to be brought against PAHO? I don't know that... I don't think that's our position, Your Honor. The position would be instead that what's alleged here is PAHO's participation for purposes of 1589b, PAHO's participation is much broader than moving money. And in fact, there is no allegation that PAHO was moving money for a fee. The allegation here... I don't think that's a proof, that's a merits issue, or a proof issue, a summary judgment question. It's not a question for us at the threshold. I think it's a pleading issue, and the pleading issue is as follows. What matters for the foundational purposes of 1589b is what is the foundation of the claim? We submit that the foundation is forced labor and trafficking because that's what the provision is all about. Even if plaintiffs and the district court are right, that the foundation is PAHO's participation. In that case, the participation is much broader than moving money. And in fact, the fee here that was charged, the pleading, the complaint says the fee was charged for medical services, for in paragraph 38, paying PAHO fees for the doctor's labor. That's obviously a very different kind of claim than acting like a bank and moving money for a fee. As the U.S. brief explains, the payments that were made here were not payments for moving money. These were program support costs for PAHO that related to its administration of a public health program. But again, even if you accept- Well, that's not, excuse me, but that's not what the plaintiffs allege in their brief. I'm sorry, in their complaint. That's not their allegation. Well, Your Honor, their allegation- And besides, don't we look at this from the point of view of the character of the conduct? And in that sense, the question is, is this the kind of transaction that an actor in the commercial market would participate in, right? Regardless of what its motive was. Your Honor is correct that what matters is the commercial nature of the conduct, not the purpose. And we don't fight that rule. That's exactly right. What the Congress tells us is activity that's commercial in nature is the type of activity, and this is from the legislative history, where a state-owned enterprise is, quote, carrying on a commercial enterprise, such as a mineral extraction company, an airline, or a state trading corporation. Weltover, the Supreme Court's decision in Weltover, expands on that congressional guidance, and says that really we're talking about commercial activity, quote, in the manner of a private player within the market. Here, it is not even alleged that PAHO was acting as a private player in the market. What is alleged- I don't think they have to. Why do they have to allege that? All they have to allege is a commercial, what they think is a commercial transaction. Then the question we ask, is it the type of transaction that a player in the commercial market would undertake? I don't think they have to allege the legal conclusion. That's correct, Your Honor. And here, the allegation is that PAHO's administration of this program, and the money that it received for, and I'm quoting, brokering medical services, triangulating health care services for compensation, and charging fees for the doctor's labor. That is the allegation. And what we submit is even if you focus, and again, we think you should not be focused on how PAHO allegedly benefited, but rather on the fact of forced labor and trafficking, and the allegation that PAHO did benefit. But even if you focus on the how, it is not commercial for two reasons. Wait, can I just ask you, so is it your position then that set aside, set aside the, well, don't set aside anything. I mean, is it your position that based on the allegations in the complaint, that what is alleged is not in fact a violation of 1589B or RICO? Is that your point? That is our belief, is what is alleged is absolutely not a violation of 1589B. Suppose, just humor me for a minute, suppose it was. Then would you agree that this case is very different from Nelson, Sachs, and James III? No. And the reason is, the reason is, because even if there is moving money for a fee happening in the United States, it is not the gravamen or foundation of the 1589B claim. And the reason- Well, but let me just pursue that. In Nelson and Sachs and James III, there was no allegation at all that the commercial transaction, the payments in Nelson, the ticket in Sachs, and the loans in James, there was no argument that those were in any way inappropriate or illegal. Whereas here, that is, you may be right that their allegations don't make it out to be illegal. But if it is illegal, then it is different from Nelson, Sachs, and James III. It is different because they are alleging not just a financial transaction that is independent of what happened in a foreign country, but an illegal financial transaction that violates federal law. That is completely different, isn't it, than Nelson, Sachs, and James III? That is a distinguishing feature. However, you are still back, Your Honor, to the parameters of the commercial activity exception. And Sachs itself pointed out that it emphasized that, look, we are dealing with a situation where all the cause of actions allege relate back to one event, whereas we do not have that here, assuming, again, that the allegations are sufficient to make out a violation of 1589B. Your Honor, I do not think that is right. I think all of the claims and all of the allegations relate back to the same foundation. The foundation of the entire case, the foundation of every claim as pleaded, is that Mice Medicus involved forced labor and trafficking. The only question here is whether PAHO's connection to that forced labor and trafficking amounted to commercial activity for purposes of the FSIA and the IOIA. I just want to get clear. I mean, I understand your instinct to sort of roll the two issues together, whether there is a separate financial, you know, brokering here and the statutory question, but I really would like to have a clearer sense of your position on the statutory question. So the statute says it has a separate provision that forbids knowingly which has engaged in the providing or obtaining of labor services by coercive means, knowing and reckless disregard that it has done so. So I understand Congress to be looking at a distinct harm there, that it's saying, knowing that something has taken place in the past, you harm the U.S. market if you participate in commercial activity relating to that. And the question is, why isn't that different from Nelson and Sachs? And Congress has effectively defined a distinct gravamen of the domestic conduct there that just is a missing piece in Nelson, Sachs, and Gen III. A financial benefit as the standalone violation, the financial benefit in the U.S. Your Honor, under both 1589A and 1589B, the harm to the plaintiffs is exactly the same. What actually injured the plaintiffs is the forced labor and trafficking. One thing that strikes me as curious about this, that is clearly an injury under the statute. It's clearly an aim of every provision of it. But one thing that's strikingly different here from in the other three cases is that this is also a criminal provision, meaning that there is a harm to the public. And the harm to the public from benefiting from an enterprise that has used forced labor is also a harm to the market. It's unfair competition. It's undercutting. It's really distorting the U.S. market. And why isn't that also a harm and also a gravamen in a way that the buying of the train ticket or the negotiating the employment contract or the giving of the loan in our other three cases wasn't? Well, three answers to that. First, Sachs, Nelson, and this to focus on the actual injury to the plaintiffs, not to society. Even if there's a harm to society from forced labor and trafficking, and of course there would be if it were occurring, that harm in this case would be happening in Cuba and Brazil. And I guess I'm not sure that the I'm sorry to interrupt, but it's critical to me to understand your point here. Why is your point is that 1589B does not add any additional, what should I say, harm? Congress added 1589B for a reason, right? To provide a remedy for people who are injured by an entity who knowingly, financially or otherwise, participates in one of these ventures. That's why they added it. So it's different from A. And I guess what Judge Pillard and I are both getting at, maybe using different languages, the presence of 1589B and RICO in this case seems to distinguish this case quite clearly from Nelson, Sachs, and JAMS III, where you didn't have a claim about an independent behavior that itself violated federal law. And I still haven't heard- I see. That's helpful, Your Honor. Sorry to interrupt. No, please. Yeah. On 1589A and B, the court is absolutely right that those were designed by forced labor and trafficking and the entity that benefits from that providing and obtaining. And so they do reach potentially different entities. Here, PAHO is alleged to have done both. It's alleged to have provided and obtained to enforce the terms to engage in trafficking and to be benefiting from that by charging a fee for its administration of Mice Medicus. What matters under Nelson, Sachs, and JAMS is that the gravamen of those two for purposes of the IOIA is the same. It's the foundation of those two things is the same in the sense that they're both ultimately about the forced labor and trafficking. And if I could back up- benefits. I really want to understand your point. Is your point that your client here is really charged- the one thing it's charged with is traffic. That's it, right? Is that your point? No, no. There are two claims here. There's a 1589A claim and a 1589B claim, but the 1589B claim is the only one here before this court because the district court concluded that forced labor and trafficking are not commercial activity. Okay, now where does that- Provisionally. Provisionally, as your opponents are very eager to point out. Sorry. I apologize, Your Honor. Provisionally. Where does that get you? Just keep going. So, Your Honor, our point is that for purposes of the IOIA, the gravamen of these two claims is the same. The analysis of the gravamen is the same. And the reason is simple. So, is your point then that once the district court concluded that the 1589A cause- I couldn't go forward- automatically the B couldn't either? Is that your point? B couldn't be a separate- an independent gravamen in this case because- The elements of the two claims are different, but the gravamen is the same. And so, yes, Your Honor. But isn't that what's critical? Yes. It's the critical difference is the elements. This is knowing participation, knowingly benefits financially. That's a separate claim. That's not the same as A. And, Your Honor, in Sachs and Nelson and Jambi IFC, as you know, the courts were facing many different kinds of claims, all of which had different elements. And in those cases, there was, quote, separately wrongful conduct in connection with some claims that was U.S. based and arguably commercial. And the courts properly said that doesn't matter because the foundation is the same. Ultimately, it's all about what happened on that- Are you talking about the breach of contract and failure to warn? Yes, or- Okay, but as the court said in theirs, that's just- that's just an example of artful pleading. I think that's the phrase it used. Whereas here, it's not- it's not something like- it's not artful pleading. They're alleging a violation of two federal statutes. That was also true in Jambi IFC, Your Honor, where the IFC was accused of negligently financing, negligently overseeing and supervising. Those were considered completely different claims, separate from the independent actor in India- Were they- were they- were they violative of federal law? I- I don't know if a failure to supervise an environmental- Was it alleged- was it alleged they were? I don't think it was, Your Honor. No. Isn't that the distinction here? I just- A major distinction between the two cases, and I still haven't heard from you why that isn't. I mean- I think- You keep citing- you keep citing Sachs, and you keep saying there's just one gravamen, but it just seems to me that this case is different because here- I'll just say it once more- that the financial transactions involved in those three cases were not themselves independently wrong or independently unlawful. And this one is, and that is not the situation Sachs, Nelson, and Jams did not face the situation we face today. So the cases are different, and it seems to me the challenge you have is to tell us why that is not a material or legally significant difference. So, Your Honor, I think one of the main reasons that it's not significant here is that if you back up and look at the big picture of what's being alleged here, it is that the Cuban government's conscription of civil service employees and the terms of their employment amounted to forced labor and trafficking. This case is so much less commercial activity than those other cases in the sense that the entire picture of this case rests on a government's employment of its own civil service employees, its deployment of those civil service employees on a patriotic medical mission to a foreign country to serve in a public health program. Correct, but the allegation is that Congress financed it. And profited from financing it. And maybe you went on the merits on the theory you're talking about, but the question is really this threshold question where we read the pleading in the light most favorable to the claims, and they've made a, you know, they've plausibly pleaded that one of the benefits to power was just, you know, pocketing a big chunk of change for doing something that these parties were aware they actually couldn't really directly do with a kind of activity objectively that commercial banks do. So two things, Your Honor. There's no allegation, and in fact, PAHO did not finance this project. There's no allegation of that. The only allegation is that... I'm sorry if I said finance, but, you know, work the transaction. Well, and that's not what's alleged either. What's alleged is that PAHO created, managed, organized, and administered MICE Medicos, that it engaged in technical cooperation, that it engaged in everything an international organization does in connection with a public health program, and that one of the things it did was receive money from a sovereign government and transmit it to another sovereign government, which, by the way, is what international organizations do in the context of almost every public program they help facilitate. Banks do that too. Commercial banks do just the same thing. Well, I don't think that there's any allegation that PAHO behaved as a commercial bank in the following sense. Yeah, but we don't have to... That's the legal conclusion. No, no. The fact is that they complain. They complain that PAHO moved money for a fee. No, they did not. I'm sorry. That does not appear in the complaint. What they say is that PAHO was paid a fee for the doctor's labor, for providing medical services, and for administering this program. The district court interpreted those allegations to mean moving money for a fee. That appears zero times in the complaint. The other thing that is important here is that Citibank is alleged to have done the transferring of the money, not PAHO. What they say is that between two sovereigns. Citibank is where the accounts were. If there were fees charged, that would have been Citibank. That wouldn't have been PAHO, and PAHO had nothing to do with that. Just as a factual matter, I think it's important both to focus on what's been alleged and to recognize that there was a commercial bank here and it wasn't PAHO. Let me put that aside. In both Youngquist, this court's decision in Youngquist and the Second Circuit's decision in Yamsistak, there were public health programs or public health insurance programs at issue. In both of those cases, the allegations were that the officials had been involved in the transferring of money, wire transfers, receipt of money, payment of money, and this court and Second Circuit both very appropriately held that that was number one, not commercial activity because it was in the context of a public health program, and two, that the public nature of the entire program could not be changed by the fact that some of the elements of the program have some similarity with what happens in the market with commercial actors. The point was they were not engaged in commerce. That is so true here. PAHO was never engaged and is not alleged to have been engaged in commerce. It was sitting between two sovereigns in a public health program located overseas, and it was doing what it always does, which is to facilitate the managing, administering, organizing, and running this public health program. I should note also that plaintiffs have accused PAHO of enforcing the terms of employment of these Cuban civil service employees. This court said in El Haddad, and I think there's no dispute that the administration of civil service employment terms is not itself commercial activity. I also want to highlight that the same exact kinds of claims were brought in the Lubion case and were rejected as non-commercial activities by both the Southern District of Florida and the Eleventh Circuit in a case that was precisely the same in the sense that it was about Cuban medical missions sent abroad. I recognize Judge Pillard's concern that the way the Cuban government runs its civil service is not how the United States runs its civil service today, and I recognize the concerns regarding that civil service. I don't think those concerns, even if they are exception. In our research getting ready for the argument, we noted that the United States in the 1960s and 70s had its own doctor's draft in which doctors couldn't choose their terms of employment, couldn't leave the service if they wanted to, and some of the other things that have been complained about here. It's not to equate the two, but rather to say that these are non-commercial activities in the core of what sovereigns do. All right. Are there any more questions? No. All right. Thank you. Mr. Dubbin. Thank you very much. May it please the court. PAHO fundamentally refuses to accept that Congress affirmatively enacted... Could I ask you to just start in a different place? Could you just start with Mr. Bowker's point? I read him this quote from your brief, which is gravamen is moving money for a fee. That's what you say the gravamen is. He points out that's from your brief. Actually, I remember looking at the site, and I didn't think the site to the complaint supported it. Where in the complaint do you allege that the gravamen is moving money for a fee and not other activities, namely supporting the program substantively? Your Honor, the complaint doesn't use the words moving money for a fee, but it doesn't have to. Judge Boasberg, who thoroughly examined the allegations of the complaint and the provisions of both statutes, took the entire corpus of what was there, including the allegations that PAHO was brought into this transaction fundamentally for the purpose of enabling it to happen because Brazil couldn't... Well, what in the complaint... Thank you, but directly... Just could you set aside Judge Boasberg's opinion for just a to see whether the allegations are sufficient? So, what would you point us to in the complaint to say that this is a commercial transaction, i.e. moving money for a fee? But where do you... Paragraphs 45 through 51. Well, paragraph one says that PAHO collects 75 million dollars for taking in money from Brazil and sending it to Cuba. Yeah, but for... That's a commercial activity, Your Honor. If you want to know about the purpose, we can address that as well. And paragraphs 45 through 51 make it clear that the reason PAHO was involved in the case was that in order for Brazil to get those Cuban doctors there, their Congress wouldn't authorize the payments. They literally says, and it's quoted from a Brazilian embassy quote, they suggested bringing in the Pan-American Health Organization as an intermediary to enable the payments to be transferred to Cuba. And that's throughout the complaint. That's moving money for a fee. Now, when Mr. Bowker talks about PAHO receiving money from sovereign members, you know, as a normal activity, I don't think it's normal for an international organization to take 1.3 billion dollars of trafficked laborers' wages and then to the entity who trafficked them. That's what PAHO did with 1.3 billion, and it put 75 million dollars in its own pocket. And as far as the argument that that went to program costs, we do allege that it did not. That's in paragraphs 87, 103, and 143. And assuming all of those, taking those allegations is true at the current procedural stage. Back to the important questions about whether Sachs, Nelson, and Jam 3 foreclosed the claim on the ground that the gravamen, that we would not be here if there were not also allegations of forced labor in violation of the other provisions of, against trafficking in Sachs, the court said it rejected the notion that there was a failure to warn claim occurring in the U.S. that could be treated as commercial activity under the Foreign Sovereign Unions Act exception because it said that the failure to warn was not wrongful commercial action within the United States. Now, you can agree or disagree. I mean, it seems in fact like a failure to warn for a known risk in the sale of a ticket for an activity that allegedly exposes the ticket holder to that risk. One could say, well, that's a wrong in the United States, but the court in Nelson said no. The court in Nelson said the gravamen was the harm to the plaintiff overseas. Why are we not in the same situation here? As Judge Boasberg pointed out, a case can have two gravamen. He determined the 1589A claim was not a commercial gravamen, but he clearly said that the 1589B claim is commercial and is a self-contained wrong. As Your Honor pointed out in your questions to the appellant, 1589B makes it a crime to knowingly benefit from participation in a forced labor venture, and that's what we have alleged Pavo did. And Judge Boasberg, you know, cited footnotes which makes it clear that in another case, based upon A2, where the gravamen might have occurred in two places, we would be in a different place. That basically anticipated our case. Our case is a self-contained wrong by Pavo violating 1589B, as Judge Boasberg meticulously documented in his analysis, which is entitled to deference. We're here on a 12B6 standard, and he, his, yes, we're entitled to the benefit of everything. De novo review. De novo review, but we're entitled to the benefit of every inference in the complaint, and Judge Boasberg. That's, we also apply that standard and make those inferences, but so I'm just, help me out, because it just seems that it has to be true here, as in Nelson, that the allegations about the commercial part in the United States would alone, as in Nelson, entitle Nelson to nothing without the allegations of, in Nelson, the personal injury abroad, and here the forced labor abroad. Your Honor, this is a separate wrong, okay? Taking my client's money and putting it in your pocket, taking my client's money and sending 1.3 billion dollars to Cuba, okay, that all happened here in the United States, and that's what Pavo did. And Congress specifically added 1589B in 2008, as the congressional amicus brief shows, as the trafficking victims legal centers brief shows, specifically because just going after the trafficking itself was not doing the job of eliminating the problem. So we have a separate raven in here that Pavo profited from its knowing participation. Now Secretary of State Blinken has stated for the last 10 years that Pavo, that Cuba's medical missions are trafficking and are for Cuba's profit, and knowing that, Pavo knowingly got involved in this transaction and profited from it. That's a separate violation of 1589B. Well, this is where I'm struggling, because there is a separate violation of law alleged in Nelson. The recruiting of Mr. Nelson in the United States, the defendants omitted important information about his prospective employment, and the allegations were that it knew or should have known that as somebody who's being hired to do quality control for a Saudi Arabian hospital, when they try to actually criticize the safety and quality in that hospital, is going to be severely punished. And so the allegations are that omitting that important information during the recruiting was itself a separate harm under U.S. law. And the court said, no, gravamen in Saudi Arabia. And I'm just looking for distinctions between that and this case. The gravamen of a violation of a statute that makes it a crime to knowingly benefit from participation in forced labor is knowingly participation in a venture that's forced labor. And that's what we've alleged Pavo did. That's a self-contained gravamen. Whatever Your Honor thinks about the result in Nelson, we have a self-contained gravamen here under a statute that Congress specifically enacted to capture this very activity. That's the reason we have 1589B. And the complaint clearly alleges that Pavo knowingly pocketed $75 million it knew was money from the wages that were owed to my client. That's a crime and that's something where there's a civil right of action. I'd like to make a, and I would analogize the Judge Boasberg's conclusion about the gravamen to this court's decision in De Schepel when the government of Hungary argued that the plaintiffs had not alleged that Hungary promised to return that property to the United States. And this court said that it was a fair inference from the facts alleged in the complaint, which were that Hungary promised to return the property to the plaintiffs and knew the plaintiffs lived in the United States, that that was going to have a direct effect in the United States. We're entitled to the same benefit of the inference here that Judge Boasberg drew from the allegations of the complaint. I'd like to briefly comment on the government's brief because they agree with the plaintiffs that the World Health Organization Constitution does not they acknowledge that they don't have a position on whether or not PAHO's money, the money PAHO received was used for program expenses. I'm sorry, would you just repeat what you just said? I'm sorry, you clicked out for a second. What did you just say? We agree with the government that PAHO is not entitled to absolute immunity under the World Health Organization chart. And that position of government is entitled to deference. No, I heard that. But what was that about money? You just said that they don't take a position on whether or not the plaintiffs have adequately alleged the nature of the money that was received by PAHO. So our position is that this is not before the court. The complaint does allege, as I stated before in paragraphs 87, 103, and 143, that none of the money that PAHO received was used for program expenses. And there's no reason for the court to venture into that here. But if the court were so inclined to ask the government, there's no application of that would affect this case. And so if the issue is that PAHO's receipt of $1.5 billion from Brazil and sending $1.3 billion back to the trafficker is a program expense, that's not tenable. If their argument is that some of the $75 million that PAHO received and put in its pocket was used for quote program expenses, that would be an argument about purpose and would not be relevant to the jurisdictional determination. Mr. Dubbin, you're over your time. Thank you very much. We'll hear from Mr. Yellen. Thank you, Your Honor. Good morning, Your Honors, and may it please the court, Louis Yellen from the Department of Justice here today on behalf of the United States. As the court knows, the United States is here for a very limited purpose to address one issue that the court may have to consider, that is the non-commercial nature of an international organization's receipt of program support costs from a member state. The basic principle that we urge is that if the program itself is public, then the money paid by a member state for program support costs is also public. Now, the parties have taken different views about what the government's brief has said, and they're not exactly right, and I'd like to clarify this because I think it goes to an important part of the court's colloquy earlier in the argument. It's not the case that the government has endorsed the idea that the payments here were part of program support costs, but it's also not the case that the United States has not taken a position on whether the plaintiffs adequately alleged that the payments were not program support costs. The point, I think, that our... In other words, you have not taken a position on whether they've adequately alleged? The question isn't one about allegations, and this is the critical point that I'm hoping to be able to explain to the court. The question about whether or not payments are part of program support costs is part of the immunity question. It goes to the commercial nature of the transaction. Let me give you an analogy. Recall that the IOIA tracks the FSIA's commercial activity exception. Now, imagine a foreign sovereign paying one of its agencies, providing in its budget funds for the payment of contractors to provide medical services. If a plaintiff sued the foreign sovereign on the theory that the foreign sovereign's payment to the agency was commercial in character, the court would have to consider the nature of the program, that is, the nature of the enterprise that the foreign sovereign and its agency were undertaking. Just so in the IOIA context, the question is, if an international organization receives from a member state payments of program support costs in connection with a public program, those payments are also public, that is, they're part of the public, that is, non-commercial enterprise in which the international organization is engaging on behalf of the member state. Okay, so from the U.S.'s point of view, what's the question we should ask here? The question is whether... What's the first question that we should ask about this case? The question that this court needs to consider is whether the district court properly determined that there was a commercial activity at issue here. Yeah, I know that. And, well, I'm sorry, I'm sorry, I had a comma there, Your Honor, and I didn't quite finish the thought. And part of that inquiry involves, in the context here, determining whether the payment was in part of program support costs on behalf of a public program that PAHO had undertaken on behalf of member states. The court, it's not sufficient to... At this stage, isn't that just a question of looking at the complaint and seeing what is alleged? No, Your Honor. A court, in an immunity matter, a court cannot turn to the merits until it has determined conclusively that the international organization... No, no, I wasn't talking about... No, no, no, I'm sorry, I didn't mean to say look at the merits. Just look at the allegations of the complaint to see what the allegations are with respect to whether the money is part of a program or whether it's a fee of some kind. That's right, Your Honor. The question would be, well, what's next, Your Honor? Let's assume that as a pleading matter, the court determines, okay, there's an allegation that this payment was commercial. Well, the international organization or a foreign state disputes that, right? The question is, you don't get to then go on to a merits determination because the court has not yet adjudicated fully the immunity or jurisdictional question. I'm sorry to interrupt. I just want to... Is what you're saying that the next thing, assuming, let's say we're not involved in this and Mr. Bowker didn't appeal. The next question in the district court would be, before you get into trial on the merits, we want to do a trial on those facts that go to whether the allegations about pocketing a fee are supported. Let's focus at the front end and actually have a final factual determination, subject to clearly erroneous review, whether there was some kind of sweetheart deal, where PAHO is profiting off of forced labor, or whether when PAHO opens its books, it's running a program, it's doing support costs, it's paying its people for overseeing all of this stuff. If the latter, then immunity actually, at that later point, kicks in. Is that your position? Maybe, Your Honor. Let me clarify what I mean by maybe. The further inquiry may not require a trial on the facts of jurisdiction. It could be in a summary judgment posture. Exactly. The only point is the court would be looking outside of the pleadings. Just as in the Supreme Court's recent decision in the Helmera campaign case, a district court has to decide at the outset whether the requirements for immunity have been satisfied or not. That is something that has to be done before the court gets to the merits. There is a dispute in this case. The dispute is something that the United States has not taken a position on. There's a dispute about the nature of the particular transactions and their connection or not to a public program. What you're saying is that even if pleadings are adequate, there continues throughout a case, a kind of priority on the factual assertions, then turning into evidence, then turning into findings of fact should, God forbid from PAHO's perspective, that have to go that far. There should be a priority at each stage in verifying whether the key facts that support the commercial activities exception are materializing or not. I think that's right. The only qualification I would make, Your Honor, is that it may not be purely factual. There could be legal components to the inquiry as well, depending on the nature and the structure of the international organization, its setup pursuant to its organic documents with the member states. All of these things may be relevant to the nature of the setup. The bottom line that I would wholly endorse, Your Honor, is that before a court were to reach the merits of a claim against an international organization, it would have to be sure that the claims actually satisfy the requirements of the commercial activity exception. That requires not only that the claim be based upon certain action, that is, that the gravamen of the claim be based upon actionable claims, but that those things, actions on which it's based upon, are commercial in nature and not public. Mr. Yellen, I just have a simple question. I just want to make totally sure I understand the United States position. We have this on a motion to dismiss, right? Yes, Your Honor. Okay. So we look at the complaint, right? And we ask whether the allegations are sufficient, giving the benefit of all inferences to the plaintiff, correct? And if we decide they are, then your point is PAHO could still file a motion for summary judgment, and that would require that allegations be proven before the court can make a judgment on immunity, correct? Do I have it? Yes. I'm sorry. I'm thinking through this, Your Honor. I believe that's correct. Okay. Thank you. And it might present, as you're pointing out, whatever the legal issue is that we decide is decided on the basis of whatever the facts are at the relevant stage. And so here, the plaintiffs have alleged something, and we could decide a legal question. The legal question we might be deciding at summary judgment might shift because the facts that are evidenced to a level sufficient to create a triable issue might be different. So they might have a more challenging legal argument at the summary judgment stage, a distinct and more challenging argument. So it might not be law of the case, and it might require some different legal analysis. Is that what you're saying? That might be right, Your Honor. I guess the only qualification I want to give is international organizations are not like commercial enterprises set up by states. International organizations, by their very nature, deal with public programs on behalf of their sovereigns. And so it would be the extraordinary case that would get very far. And the court needs to be, I think, cautious about the potential for artful pleading to string out litigation against an international organization, given this background, given that the typical conduct in which international organizations engage is public and not commercial. This is something the court needs to be cautious about. And I want to be very clear that we are not signaling anything about the underlying case here. It's just a general concern that the United States have about the nature of international organizations and the public programs and the payments that sovereign states make to those organizations that are roughly analogous to payments that sovereign states make to their non-commercial agencies. The rule that the court lays down here will have implications not only for international organizations and conceivably have an impact on the United States funding of international organizations, but also conceivably could have an impact on the commercial activity under the FSIA. If there are no more questions, Mr. Belker, why don't you take two minutes? Thank you, Your Honor. I'll make just a few quick points. First, PAHO's position is that this is resolvable on the face of the complaint, that PAHO's immunity is immunity not only from liability, but from the burdens of litigation. The reason it's resolvable on the face of the is the complaint alleges that PAHO was paid in connection with its administration of an enforcement of the terms of employment of this Cuban medical mission and MICE Medicos. I'll point the court to paragraphs 1, 6, 19, and 38, all of which explain that PAHO was being paid for labor, for medical services, and for its, quote, enabling, managing, and enforcing of this trafficking. What were those paragraphs again? It's 1, 6, 19, and 38. I'll repeat what I said earlier, which is that moving money for a fee does not appear in the complaint. The second point is in response to my colleague's point about expenses versus program support costs. We're not fighting with the allegation that PAHO didn't pay for out-of-pocket expenses, things like travel, food, lodging. We're not fighting with those allegations. The point here is the point that the United States government brief explains in great detail, which is that program support costs are different. Those are for indirect or overhead costs. They're standard for all public programs for IOs, and those are different from the out-of-pocket expenses that my colleague, Mr. Dubin, was referring to, and so we don't fight with those allegations. The third point, and this, to Judge Tatel, I know that you were focused on the difference between the type of claim in Nelson and Sachs and the one here, and I just wanted to direct your honor's attention to 136 Supreme Court at 396 in Sachs, and I'm going to quote here where it says, under any theory of the case that Sachs presents, however, there is nothing wrongful about the sale of the Ural Pass standing alone, and then there's an ellipsis here. However Sachs frames her suit, the incident in Innsbruck, that's the platform in Austria, remains at its foundation, and that is true here. Standing alone, the alleged moving of money that occurred in the United States is not wrongful. The only thing that makes it... And that's because it's program support under your theory, right? No, whether it's moving money for a fee or whether it's program support costs for a fee or whatever, however it is framed, it is not independently wrongful without a connection to forced labor and trafficking overseas. That aspect of our case is exactly the same as Sachs and Nelson and Jam, and I think that's what's critical here for purposes of the commercial activity exception. All right, if there are no questions, Madam Clerk, if you'd call the next case.
judges: Henderson, Tatel, Pillard